UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL CRAIG SLATER, | ) | 1:08-CV-00571 OWW JMD HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| WILLIAM SULLIVAN, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner Michael Slater ("Petitioner") is a State prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation at the California Substance Abuse Treatment Facility in Corcoran, California. (Pet. at 2). Petitioner is serving a sentence of seventeen years to life, pursuant to a conviction on February 20, 1986, of second degree murder with a firearm enhancement. (Pet at 2; Answer at 1)

Petitioner does not challenge his conviction in this action. Instead, Petitioner challenges the decision by the California Board of Parole Hearings (the "Board"), whom he appeared before in October 2005 for a parole consideration hearing. (Pet. M. & A. at 1). The Board found Petitioner unsuitable for parole.

Petitioner subsequently filed a petition for writ of habeas corpus with the California Superior Court, the California Court of Appeal, and the California Supreme Court, challenging the Board's denial of parole. (*See* Answer Exs. 1, 3, 5). The California Superior Court was the only State court

to issue a reasoned opinion. (*See* Answer Ex. 2). The California Court of Appeal and the Supreme Court issued summary denials of Petitioner's request for relief. (Answer Exs. 4, 6).

On February 6, 2008, Petitioner filed the instant federal petition for writ of habeas corpus in the Central District of California. (Court Doc. 1). The case was transferred to this Court on April 21, 2008.

On September 3, 2008, Respondent filed a response to the petition. Respondent admits that Petitioner has exhausted his state remedies and that the instant petition is timely. (Answer at 2).

On October 27, 2008, Petitioner filed a reply to the Respondent's answer.

## FACTUAL BACKGROUND

As the facts of the commitment offense are relevant to determining whether Petitioner is suitable for parole, the Court recites the facts as stated in the record of the parole hearing. *See* Cal. Code Regs., tit. 15, § 2402(c)(1). The Board first incorporated into the record a summary of the offense, which stated that:

> On 7/9 of 1985 at 9:50 a.m., West Hollywood Sheriff Officers responded to reports of an injured person. When officers arrived, they observed a victim who had a large amount of blood on the right side of his head. Paramedics arrived and transported the victim to Cedars Sinai Hospital. The victim was pronounced dead at 1:05 p.m. as the result of severe brain damage and cardiac arrest. An investigation was conducted. Witnesses state that [Petitioner] arrived at the residence at approximately 9:50 a.m. on 7/9 of '85. He was allowed to enter and was led to a bedroom area where he sat for about three minutes. The victim, Gary Boice (phonetic), came a few minutes later. [Petitioner] quickly got up and stepped i front of Boice and prevented him from moving any further. [Petitioner] reached into a briefcase that he was carrying and pulled out a grey revolver. He opened the cylinder fo the revolver, spun it around, and closed it. He told the victim, 'This is what we do to people.' He pointed the gun at Boice's right temple, fired one round to the right side of the victim's head. [Petitioner] then said, "Oh, my God. Oh, my God. I'm sorry. I'm sorry.' [Petitioner] then fled, taking the gun and briefcase.

(Traverse Ex. B, Parole Hearing Transcript, at 7-9).

Additionally, the Board read into the record Petitioner's version of events, obtained from a previous parole hearing, which stated:

> I took a taxi to Gil's to pop in and say a brief hello, and possibly sell some drugs. We were talking in his bedroom with[sic] Gary, who had been sleeping on the living room couch, woke up, and walked by the bedroom door on his way to the bathroom. Gil stopped him and they began to argue about money. With the taxi waiting downstairs, I soon became impatient. To put a stop to their arguing and allow me to finish up with Gil, I decided to scare Gary. Within their view, I removed all the bullets from my revolver except one. I feigned kind of a Russian Roulette by

spinning the cylinder, while secretly watching to make sure the bullet was not in firing position. Then I stepped up to Gary and pointed the gun to his head. I said something to Gil along the lines of 'This is how to play.' And I pulled the trigger. To my shock, and everyone else's, the gun fired, shooting Gary in the head, dropping him to the floor. Pandemonium erupted. I yelled for Gil to call an ambulance, which either he or Jackie, who had been cooking in the kitchen, immediately did. After I calmed down, I thought there wasn't anything I could do to help Gary, and I wasn't ready to turn myself over to the law. So I left with Gil and Jackie and fled the apartment.

(Id. at 9-11).

## **DISCUSSION**

### **I.    Jurisdiction and Venue**

A person in custody pursuant to the judgment of a State court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution stemming from the Board's denial of parole. Petitioner is currently incarcerated at Corcoran State Prison, which is located in Kings County. Kings County is within this judicial district. 28 U.S.C. § 84(b). Thus, the Court has jurisdiction over and is the proper venue for this action. *See* 28 U.S.C. § 2241(d).

### **II.    ADEPA Standard of Review**

All petitions for writ of habeas corpus filed after 1996 are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted by Congress on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed in 2008 and is consequently governed by AEDPA's provisions. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).

While Petitioner does not challenge his underlying conviction, the fact that Petitioner's custody arises from a State court judgment renders Title 28 U.S.C. section 2254 the exclusive vehicle for Petitioner's habeas petition. *Sass v. California Board of Prison Terms*, 461 F.3d 1123,

1126-1127 (9th Cir. 2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that § 2254 is the exclusive vehicle for a habeas petitioner in custody pursuant to a State court judgment even though he is challenging the denial of his parole).  Under AEDPA, a petition for habeas corpus "may be granted only if [Petitioner] demonstrates that the State court decision denying relief was 'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'" *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see also Lockyer*, 538 U.S. at 70-71.

As a threshold matter, this Court must "first decide what constitutes 'clearly established federal law, as determined by the Supreme Court of the United States.'" *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* (quoting *Williams*, 592 U.S. at 412). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the State court renders its decision." *Id.*

Finally, this Court must consider whether the State court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law." *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the State court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the State court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the State court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant State court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the State court's application of clearly established law was "objectively unreasonable." *Id.* at 409.

1  Petitioner bears the burden of establishing that the State court's decision is contrary to or
2 involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*,
3 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth
4 Circuit precedent remains relevant persuasive authority in determining whether a State court decision
5 is objectively unreasonable. *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v.*
6 *Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).
7  AEDPA requires that a federal habeas court give considerable deference to State court
8 decisions. The State court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1).
9 Furthermore, a federal habeas court is bound by a State's interpretation of its own laws. *Souch v.*
10 *Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537
11 U.S. 1149 (2003).

**III.    Review of Petitioner's Claim**

13  Petitioner raises three grounds for relief, all alleging that the Board's decision deprived him
14 of the right to due process of the law. (*See* Pet. M. & A.). In his first ground for relief, Petitioner
15 contends that the Board's reliance on the commitment offense to deny him parole violated his
16 constitutional rights. (Id. at 1-4). Petitioner's second ground for relief alleges that the Board
17 improperly relied upon a rules violation to find him unsuitable for parole. (Id. at 5-6). Petitioner
18 asserts as his third ground for relief that his due process rights were violated by the Board's reliance
19 on immutable factors, including Petitioner's criminal misconduct prior to incarceration. (Id. at 7-8).
20 Explicit in each ground for relief is Petitioner's contention that the denial of parole was arbitrary and
21 not supported by "some evidence" as required by the Due Process Clause. The Court initially
22 examines whether the State court's decision, upholding the denial of parole, is an unreasonable
23 application of clearly established federal law. *See Williams*, 529 U.S. at 407-408 (explaining that
24 where there is no factually on-point Supreme Court case, the State court's determination is subject to
25 the unreasonable application clause of 28 U.S.C. § 2254).
26 \\\
27 \\\
28 \\\

### *A.     Legal Standard for Denial of Parole*

"We analyze a due process claim in two steps. '[T]he first asks whether there exist a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Sass*, 461 F.3d at 1127. The United States Constitution does not, by itself, create a protected liberty interest in a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). In briefs submitted to the Court, Respondent argues that Petitioner does not have a liberty interest in parole despite recognizing the existence of Ninth Circuit authority to the contrary. (Answer at 2-3). The Ninth Circuit has held that a prisoner possess a liberty interest in parole where mandatory language in a State's statutory scheme for parole creates a presumption "that parole release will be granted' when or unless certain designated findings are made, and thereby give rise to a constitutional liberty interest.'" *McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002) (quoting *Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979) in holding that California's parole scheme gives rise to a cognizable liberty interest in release on parole). California Penal Code section 3041 contains the requisite mandatory language, thus vesting California prisoners "whose sentence provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons*, 505 F.3d at 850; *see also McQuillion*, 306 F.3d at 903; *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003). Consequently, the Court finds that Petitioner has a protected liberty interest in a parole date.

A finding that a liberty interest exists does not end the Court's inquiry as the Due Process Clause is not violated where the denial of a petitioner's liberty interests follows the State's observance of certain procedural safeguards. *See Greenholtz*, 442 U.S. at 12. In addition to arguing that Petitioner has no federally protected liberty interest in parole, Respondent alternatively argues due process merely entitles Petitioner the right to be heard, advance notice of the hearing, and for the Board to state their reasons for denial. (Answer at 3). This contention is based on the argument that the "some evidence" standard does not constitute clearly established federal law and is not applicable to parole denials. (*Id*. at 5). Respondent is correct in one respect; a parole release determination is not subject to all of the due process protections of an adversarial proceeding. *See Pedro v. Oregon*

*Parole Board*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a Petitioner in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." *Id*. at 1399; *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987). Thus, an inmate is entitled to receive advance written notice of a hearing, be afforded an "opportunity to be heard" and told why "he falls short of qualifying for parole." *Greenholtz*, 442 U.S. at 16; *see also Pedro*, 825 F.2d at 1399. Here, the Court notes that Petitioner does not allege that he was deprived of any of these rights.

      The Ninth Circuit has consistently recognized that a prisoner's due process rights are implicated where there is no evidence to support the denial of parole. *Irons*, 505 F.3d at 851; *see also Sass*, 461 F.3d at 1128-1129. "In *Superintendent, Mass. Correc. Inst. v. Hill* [472 U.S. 445 (1985)] the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process' unless the findings of the prison disciplinary board are supported by some evidence in the record.'" *Sass*, 461 F.3d at 1128 (citations omitted). The Ninth Circuit has held that the same standard of "some evidence" that applies to the revocation of good time also extends to parole determinations and that this same standard of judicial review applies to habeas petitions regarding parole denials. *Irons*, 505 F.3d at 851; *Sass*, 461 F.3d at 1128-1129. This evidentiary standard prevents arbitrary deprivations of the prisoner's liberty interest without imposing undue administrative burdens or threatening institutional interests. *Hill*, 472 U.S. at 455. Thus, the Court finds that the "some evidence" standard is applicable to Petitioner's denial of parole.

      The inquiry of "whether a state parole board's suitability determination was supported by 'some evidence'" is framed by the California statutes and regulations governing parole suitability. *Irons*, 505 F.3d at 851; *see Briggs*, 334 F.3d at 915. Significantly, California's Supreme Court has consistently found that in order to comport with due process, the Board's denial of parole must be supported by "some evidence." *In re Dannenberg*, 34 Cal.4th 1061, 1071 (Cal. 2005); *In re Rosenkrantz*, 26 Cal.4th 616, 625-626 (Cal. 2002) (applying some evidence standard to governor's authority, under Article V, section 8(b) of the California Constitution, to reverse a grant of parole). A federal habeas court defers to a state court's interpretation of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) and *Mullaney v. Wilbur*, 421

U.S. 684, 691 (1975), for the proposition that, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Thus, Respondent's contention must fail as California law clearly provides for the additional procedural safeguard of requiring some evidence to support the Board's denial of parole.

The dispositive inquiry now before this Court is whether the Superior Court's decision was an unreasonable application of the "some evidence" standard. This inquiry is framed by the statutes and regulations governing parole suitability determinations in California. *Irons*, 505 F.3d at 851; *Briggs*, 334 F.3d at 915. California law provides that after an eligible life prisoner has served the minimum term of confinement required by statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole. Cal. Code Regs., tit. 15, § 2402(a); *see In re Dannenberg*, 34 Cal.4th at 1078, 1080. The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors set forth in the California Code of Regulations. *See* Cal. Code Regs., tit. 15, § 2402; *Irons*, 505 F.3d at 851-852; *Biggs*, 334 F.3d at 915-916. The regulations permit consideration of "all relevant, reliable information available to the panel," and explicitly calls for consideration of "the base and other commitment offenses, including behavior before, during and after the crime."[1] Cal. Code Regs., tit. 15, § 2402(b). Factors supporting a finding of unsuitability for parole include: the underlying offense was carried out in an "especially heinous, atrocious or cruel manner"; a record, prior to incarceration for the underlying offense, of violence; a history of unstable relationships with others; and serious misconduct while

---

[1] The statute specifically states: "All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstance which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." Cal. Code Regs., tit. 15, § 2402(b).

incarcerated. Cal. Code Regs., tit. 15, § 2402 (c); *see also In re Shaputis*, 44 Cal.4th 1241, 1257 n. 14 (Cal. 2008).

The California Supreme Court has recently held that even where the commitment offense was particularly egregious, reliance on this immutable factor would violate a petitioner's due process rights under the regulations and statutes governing parole suitability in California where:

> evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety.

*In re Lawrence*, 44 Cal.4th 1181, 1191 (Cal. 2008) (emphasis in original).

In *Lawrence*, the California Supreme Court found that a commitment offense that had occurred over thirty years prior to the Governor's reversal of a parole grant was no longer probative of the petitioner's current dangerousness. The *Lawrence* court found that the intervening twenty-four years in which petitioner, now age sixty-one, had demonstrated, "extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole" rendered "the unchanging factor of the gravity of petitioner's commitment offense" no longer probative of "her current threat to public safety, and thus provides no support for the Governor's conclusion that petitioner is unsuitable for parole at the present time." *Id*. at 1226.

The *Lawrence* court noted however that there were some circumstances where reliance on a commitment offense would comport with due process, such as where the conviction offense was so heinous, atrocious, or cruel that the gravity of the crime itself established current dangerousness. *Id*. at 1228. Furthermore, the *Lawrence* court observed that a discipline-free record while incarcerated does not automatically render the commitment offense unpredictive of current dangerousness. *Id*. (citing *Lawrence*'s companion case, *In re Shaputis*, 44 Cal.4th 1241, 1259-1260 (Cal. 2008), in concluding that lack of insight into the commitment offense rendered aggravating factor of the crime probative of petitioner's current dangerousness such that Governor's reversal of parole was neither

arbitrary or capricious despite an inmate's discipline-free record during incarceration).

### *B.     State Court Decision*

After reviewing the record, the Court finds that the California Superior Court unreasonably applied the some evidence standard. *See* 28 U.S.C. § 2254(d)(1). The State court's decision was unreasonable as it conflated the ultimate inquiry, whether Petitioner was currently dangerous, with the inquiry of whether "some evidence" supported an unsuitability factor. The California Supreme Court in *Lawrence* held that, "[t]he relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate." *Id*. at 1227. The court noted that such a holding was not novel as this "conclusion that current dangerousness (rather than the mere presence of a statutory unsuitability factor) is the focus of the parole decision *is rooted in the governing statute*." *Id*. at 1210-1211 (emphasis added). The *Lawrence* court further reiterated that the decision did not mark a break with previous State court precedents in discussing why its decision would not produce a wave of reversals, explaining that even prior to *Lawrence,* the "overwhelming majority" of State appellate court's decision affirming a denial of parole "was not founded solely upon the conclusion that the circumstances of the commitment offense were more than what was minimally required to obtain a conviction of that offense, but rather upon the presence of other additional statutory factors establishing unsuitability." *Id*. at 1228.

Here, it is obvious that the State court conflated the two inquiries as the court assumed that the modicum of evidence supporting a finding that the motive for the crime was trivial meant that Petitioner was currently dangerous. The Superior Court's analysis of whether there was some evidence to support the Board's finding was limited to the following:

> [T]here is some evidence to support the board's finding that 'the motive for the crime is inexplicable or very trivial in relation to the offense'...The Board concluded that the motive for killing this man was a 'cruel joke.' [Citation] Petitioner claimed that the decided to point the gun at the victim because he was impatient at the interference of his drug sale. *This motive is materially less significant than those that conventionally drive people to commit murder; therefore there is some evidence to support the Board's conclusion that petitioner continues to pose a risk of danger to society.*

(Answer Ex. B at 2-3) (emphasis added).

\\\

Despite the Superior Court's recognition that its ultimate inquiry was with regard to Petitioner's current dangerousness, the Superior Court's decision focused exclusively on whether there was some evidence to support the trivial nature of the motive.  The Superior Court further failed to explain how the trivial nature of the motive, for a crime committed over twenty years previously, was probative of Petitioner's *current* dangerousness.  Considering there is a lack of evidence in the record to indicate that Petitioner actually intended to kill the victim, as discussed *infra*, it is unclear how this factor holds any value in determining Petitioner's current dangerousness.  Thus, the State court's *sole* reliance on the trivial nature of the motive was an unreasonable application of the some evidence standard.

### C.     Parole Board Decision

Therefore, the Court proceeds to examine whether there was some evidence, outside of that cited by the Superior Court, to support the Board's denial of parole.  As a federal habeas court may only grant relief if a Petitioner's constitutional right is violated, the existence of some evidence in record would preclude the Court from granting the petition.  *See Butler v. Curry*, 528 F.3d 624, 641 (9th Cir. 2008) (citing 28 U.S.C. § 2241(c)(3) in noting that a federal habeas court's finding that State court's decision is contrary to established federal law does not end that court's inquiry as, "[o]ur power to grant the writ of habeas corpus to a state inmate depends on his actually being 'in custody in violation of the Constitution or laws ... of the United States'").

The Board noted that finding Petitioner unsuitable for parole was a difficult decision that they "wrestled with." (Traverse Ex. B at 51).  Ultimately, the Board relied on three factors to find that Petitioner currently posed an unreasonable risk of danger to the public safety: (1) the commitment offense, (2) prior criminal misconduct, and (3) unstable social history.[2]  After reviewing the record, the Court finds that the record is devoid of evidence to support the Board's finding that Petitioner currently posed an unreasonable risk of danger to the public.

\\\

---

[2] Contrary to Petitioner's assertion otherwise, his disciplinary infraction does not seemed to have weighed against him.  The Board stated with regards to the infraction, "[w]e're not going to get too excited.  I asked my partner if he had to dry his laundry in his cell, he would be accused of putting up a huge tent.  And he'd get a 128 in a minute.  And so you should be commended on one or two chronos [sic] in 20 years." (Traverse Ex. B at 53).

### 1.     *Probative Value of Commitment Offense*

State regulations permit consideration of the following factors in determining whether the commitment offense favors the denial of parole: the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; the victim was abused, defiled or mutilated during or after the offense; the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable or very trivial in relation to the offense. Cal. Code Regs., tit. 15, § 2402(c)(1). Pursuant to California law, "all second degree murders by definition involve some callousness–i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." *In re Smith*, 114 Cal.App.4th 343, 366 (Cal. Ct. App. 2003) (citations omitted); *see also People v. Nieto Benitez*, 4 Cal.4th 91, 102 (Cal. 1992) (stating "[s]econd degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elements–i.e., wilfulness, premeditation, and deliberation–that would support a conviction of first degree murder"). Thus, a showing of exceptional callousness, cruelty, or dispassion for human suffering requires evidence that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder." *In re Scott*, 119 Cal.App.4th 871, 891 (Cal. Ct. App. 2004); *see also In re Dannenberg*, 34 Cal.4th at 1095 (quoting *In re Rosenkrantz*, 29 Cal.4th 616, 683 (Cal. 2002) for the proposition that reliance on commitment offense as some evidence requires aggravating facts beyond the minimum elements of the offense).

In discussing the commitment offense, the Board concluded that the manner in which the crime was committed was "cruel and callous, dispassionate, calculated." (Traverse Ex. B at 51). The Board seems to have based this finding on the motive of the crime as the shooting itself does not seem particularly egregious. A motive is inexplicable or trivial where it "is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and serves no other discernible purposes. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." *In re*

*Scott*, 119 Cal.App.4th at 893 (further noting that "to fit the regulatory description, the motive must be materially less significant (or more 'trivial') than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of a danger to society if the prisoner is released than is ordinarily presented"); *see also In Barker*, 151 Cal.App.4th 346, 374 (Cal. Ct. App. 2007) (quoting *in re Scott*, 119 Cal.App.4th at 893 for the proposition that, "[g]iven the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed 'trivial.' The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must 'normally' be given release dates when they approach their minimum eligible parole dates").

Here, the record does not contain any evidence that Petitioner's crime exceeded the minimum necessary for second degree murder. The Board itself seemed to have questioned whether Petitioner had the intent necessary for second degree murder, stating that they were unsure if Petitioner meant to kill the victim. (Traverse Ex. B at 51, 52). This statement is based on the factual summaries read into the record that indicates Petitioner intended to scare the victim when he pointed the gun at the victim's head. (Id.). Thus, the Board's finding that the crime was particularly egregious is questionable considering the Board itself questioned whether the crime met the minimum necessary for second degree murder.

More importantly, even if the crime was particularly egregious, the Board failed to explain how the commitment offense offers probative value of Petitioner's current dangerousness considering the time that has lapsed since the crime was committed. *See Irons*, 505 F.3d at 854 (recognizing that continued incarceration based solely on immutable factors, such as the commitment offense, may eventually rise to the level of a due process violation); *see also Biggs*, 334 F.3d at 917; *In re Lawrence*, 44 Cal.4th at 1228 (rejecting use of the commitment offense to constitute some evidence where the commitment offense is no longer probative of Petitioner's current dangerousness).[3] The Board does not state, nor does the Court find it probable, that the commitment offense is likely to reoccur based solely on Petitioner's motivation. The current case is

---

[3]*Lawrence,* 44 Cal.4th at 1228, made an exception on the reliance of the commitment offense for crimes that were so heinous, atrocious, or cruel that the gravity of the offense itself established current dangerousness. The Court does not find that the instant case to qualify as one of those offenses.

distinguishable from *Lawrence*'s companion case, *In re Shaputis*. In *Shaputis*, the denial of parole did not violate the petitioner's right to due process as other non-immutable factors existed to support the finding that Shaputis was currently dangerous, such as a lack of remorse. Here, Petitioner has not "failed to make efforts toward rehabilitation... continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse," such that "the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." *Lawrence*, 44 Cal.4th at 1228. Rather, as discussed *infra*, Petitioner's conduct in the intervening two decades was exemplary and demonstrated strong evidence of rehabilitation. *See In re Rico*, 171 Cal.App.4th 659, 680 (Cal. Ct. App. 2009). Thus, the Board's reliance on the commitment offense is erroneous as the commitment offense does not provide insight into whether Petitioner is currently dangerous.

### 2.     *Prior Criminal Misconduct*

The second factor the Board relied upon in denying Petitioner parole was prior criminal misconduct. California's regulations permit consideration of "all relevant, reliable information available to the panel...such information shall include...past criminal history, including involvement in other criminal misconduct which is reliably documented." Cal. Code Regs., tit. 15, § 2402(b). However, it should be noted that only "previous record of violence" is explicitly listed as an unsuitability factor. Cal. Code Regs., tit. 15, § 2402(c)(2) (stating "[c]ircumstances tending to indicate unsuitability include...[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age"). Thus, while the Board properly considered Petitioner's prior criminal misconduct, the probative value of Petitioner's prior is questionable at best.

Petitioner's prior criminal misconduct does not evidence an escalating pattern whereby Petitioner progressed from non-violent to violent offenses. Rather, Petitioner's entire criminal history consists of only one violent offense–specifically, the commitment offense. As summarized by the Board, Petitioner's escalating pattern of criminal misconduct consisted of stealing, being a drug dealer, not paying a hotel bill, and various drug violations. (Traverse Ex. B at 52-53). The non-violent nature of Petitioner's criminal misconduct, which mainly involved possession of narcotics,

lessens the probative value of those offenses in determining whether Petitioner currently poses an unreasonable risk of danger to the public safety.

Similar to the commitment offense, the intervening twenty years have also lessened the probative value of these offenses. As noted by the Board, the entirety of Petitioner's prior criminal misconduct relate to his use of drugs. Petitioner's record illustrates that he has participated in self-help programming, such as Alcoholics and Narcotics Anonymous, and has not used drugs in the intervening twenty year period. Thus, for the same reasons in which the Board's reliance on the commitment offense was erroneous, the Board's reliance on Petitioner's criminal misconduct prior to incarceration is also misguided. "[T]he Board's decision identified immutable factors, the commitment crime and [prior criminal misconduct], but it did not expressly rely upon petitioner's lack of insight or ability to conform his behavior to the law upon release and failed to relate the identified immutable factors to circumstances that would make them probative of petitioner's current dangerousness." *In re Lazor*, 172 Cal.App.4th 1185, 1203 (Cal. Ct. App. 2009). Nothing in the over twenty year period in which Petitioner has been incarcerated demonstrates that these two immutable factors continue to be probative of Petitioner's current dangerousness in light of the rehabilitative measures undertaken by Petitioner.

### 3.     *No Reliable Evidence of Unstable Social History*

"Stable relationships with others favor parole [citation] while 'a history of unstable or tumultuous relationships with others' weighs against parole [citation]." *In re DeLuna*, 126 Cal.App.4th 585, 594 (Cal. Ct. App. 2005) (quoting Cal. Code Regs., tit. 15, §§ 2402 (c)(3), (d)(2)). The Board seemingly found that Petitioner had an unstable social history based solely on his two year marriage and divorce despite the fact that Petitioner's family wrote support letters offering him residences and jobs. It is puzzling to the Court how one failed relationship resulting in a divorce can constitute "a history of unstable or tumultuous relationships with others." Cal. Code Regs., tit. 15, § 2402(c)(3); *see Bair v. Folsom State Prison*, 2005 WL 2219220 (E.D. Cal. 2005) (noting that, "[h]aving been divorced does not necessarily demonstrate a history of unstable or tumultuous relationships" in finding that *five* divorces does demonstrate history of unstable relationships); *see also Saunders v. Carey*, 2009 WL 426650 (E.D. Cal. 2009) (noting that there is no reliable evidence

of an unstable social history indicative of current dangerousness even where petitioner had been divorced twice). Indeed, the phrasing of the statute seems to indicate, specifically the use of the phrase "a history" and the plural form of "relationships with others", would suggest that more than one failed relationship is required. More importantly, though, it is unclear how Petitioner's failed marriage over twenty years ago evidences his current dangerousness.

Rather, the intervening events of the last two decades strongly suggests that Petitioner has rehabilitated and no longer poses an unreasonable risk of danger to society. The Board did discuss the plethora of factors tending to support suitability. (Traverse Ex. B at 54). As factors tending to support parole, the Board commended Petitioner for his disciplinary record while incarcerated noting the existence of only one disciplinary infraction for non-violent behavior.[4] (Id. at 53). Petitioner participated in vocational courses for optical technoloy, plumbing, roofing and carpentry, eventually obtaining an optician's certificate license. (Id. at 21-22, 31). Petitioner improved himself educationally, taking classes in management, accounting, health, and business mathematics. (Id. at 24). Petitioner volunteered as a tutor and coordinator for a literacy program for fellow inmates. (Id. at 27). Furthermore, Petitioner completed self-help classes, including courses in self-confrontation and anger management, while attending weekly Alcoholics Anonymous meetings. (Id. at 25-26). The psychological evaluation was favorable as the report noted that Petitioner had "good insight into his behavior and the emotionality that went with it," and that Petitioner has "gained knowledge and insight into the danger of drugs." (Id. at 29). More importantly, though, the psychological evaluation revealed that Petitioner would pose less risk of danger than the average citizen if released into the community. (Id. at 55, 29). The record also reveals that Petitioner has viable parole plans, with both parents offering him a place of residence and a job.[5] (Id. at 55).

\\\

\\\

---

[4] The record evidences that this infraction resulted from Petitioner hanging his laundry in his cell, an activity referred to as tenting.

[5] The Board's criticism that Petitioner lacks a "Plan B" in case "[w]e do have Katrina come through West LA and destroy your commercial property, you don't want it anymore" is not supported by the record, which indicates Petitioner's mother also offered her residence to Petitioner and that Petitioner has a vocational skills in manufacturing optical lenses. (*See* Traverse Ex. B at 17, 21, 30-32).

In sum, it would seem that "all of the information in [the] postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety." *See Lawrence*, 44 Cal.4th at 1227.  While the "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary,'" the Court finds record here is devoid of any evidence demonstrating that Petitioner poses a current risk of unreasonable danger to the public safety. *See Sass*, 461 F.3d at 1129 (quoting *Hill*, 472 U.S. at 457).

## REMEDY

In examining the remedies available to Petitioner, the Court initially notes that "federal habeas courts have 'broad discretion in conditioning a judgment granting habeas relief' and in 'dipos[ing] of habeas corpus matters 'as law and justice require.'" *Milot v. Haws*, 2009 WL 2046857, *3 (C.D. Cal. 2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987))*; see Burnett v. Lampert*, 432 F.3d 996, 999 (9th Cir. 2005) (stating that federal courts "have a fair amount of flexibility in fashioning specific habeas relief"); *see also Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir. 1994) (noting that federal habeas court is vested with the largest power to control and direct the form of judgment to be entered).  The district court in *Milot* rejected the assertion that the only remedy available to a habeas petition challenging the denial of parole by the Board was a new parole consideration hearing, noting that "[i]n the context of parole decisions that violate due process, there is no federal law holding that the only remedy available to a federal habeas court is a remand to the Board for a new hearing." *Milot*, 2009 WL 2046857, *3.  Additionally, the district court observed in *Milot* that recent decisions by the California courts suggest that California law permits a remedy beyond a new hearing without restrictions on the Board's consideration. *Id* at 4.

## RECOMMENDATION

Therefore, in accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be GRANTED; and
2. Judgment be entered granting a writ of habeas corpus as follows: The Board shall find Petitioner suitable for parole at a hearing to be held within 30 days of the order adopting this decision, unless new evidence of his conduct in prison or change in

mental status subsequent to the October 2005 parole consideration hearing is introduced that is sufficient to support a finding that Petitioner currently poses an unreasonable risk of danger to society if released on parole; and in the absence of any such new evidence showing Petitioner's unsuitability for parole, the Board shall calculate a prison term and release date for petitioner in accordance with California law. Further, if the release date already has passed, Respondent shall, within ten (10) days of the Board's hearing, release Petitioner from custody.  With respect to his presumptive period of parole, Petitioner is to be credited for any time that has lapsed since the release date calculated by the Board or when a finding of suitability at the October 2005 parole consideration hearing would have become final pursuant to California Penal Code sections 3041(b) and 3041.2(a)), whichever is later.

This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   July 27, 2009**                      **/s/ John M. Dixon**
                                               UNITED STATES MAGISTRATE JUDGE